IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS


EMMETT V. JORDAN and,
AMY R. JORDAN,
Individually and as natural parents of
J.V.J., a minor,
                              Plaintiffs,


v.                                                    Case No. 2:14-cv-02539-JWL-GLR



THE UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY/
KANSAS CITY, KANSAS,
And
DON ASH, Sheriff,
In his individual capacity;
CHARLES MORRIS, deputy,
In his individual capacity;
ERIC FREEMAN, deputy,
In his individual capacity;
RICK WHITBY, deputy,
In his individual capacity; and
UNIDENTIFIED DEPUTIES
Wyandotte County Sheriff,
In their individual capacities;
And

KANSAS DEPARTMENT OF REVENUE;
and
NICK JORDAN, Secretary of Revenue,
In his individual capacity;
STEVE STOTTS, Director of Taxation
For the Department of Revenue
In his individual capacity;

CARRIE PURNEY-CRIDER, agent,
In her individual capacity;
CAROL JACKSON, agent,
In her individual capacity; and
HEATHER WILSON, agent,
In her individual capacity;

                              Defendants.

## SECOND AMENDED COMPLAINT

COME NOW Plaintiffs, and for their Second Amended Complaint state as follows:

## JURISDICTION AND VENUE

1.  All of the events complained of herein occurred in Wyandotte County, Kansas; the plaintiffs are residents of Wyandotte County, Kansas.

2.  Plaintiffs' actions for damages are authorized by:

(a)  42 U.S.C. Sec. 1983, which provides for redress for the deprivation under color of any statute, ordinate, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States;

(b)  The Fourth, Fifth and Fourteenth Amendments of the United States Constitution;

(c)  The Kansas Tort Claims Act, K.S.A. 75-6101, *et seq.*;

(d)  the common law of the State of Kansas; and

(e)  42 U.S.C. Sec. 1988, which authorizes Plaintiffs' application for attorneys' fees and provides that a court may award a reasonable attorneys' fee as part of the costs in any action or proceeding to enforce a provision of 42 U.S.C. Sec. 1983.

3.  Venue is proper in the District Court of Wyandotte County, Kansas, as the

events or omissions giving rise to Plaintiffs' claims occurred in Kansas City, Wyandotte County, Kansas.

**THE PARTIES**

4.  The Plaintiffs were, at all times relevant hereto, citizens and residents of Wyandotte County, Kansas, residing in Kansas City, Kansas.

5.  Defendant Unified Government of Wyandotte County/Kansas City, Kansas (hereinafter "Unified Government") is a legally authorized political subdivision in the State of Kansas, and may be served by and through its Clerk, Bridget Cobbins.

6.  The Unified Government Commission is the authorized governing body of Defendant Unified Government.

7.  Don Ash (hereafter "Sheriff Ash") is, and was at all times material hereto, the Sheriff of Wyandotte County, Kansas.  He is the final policymaker for the Sheriff's Department regarding the training and supervision of his employees.  As a supervisor, he may also be held liable for intentionally or recklessly failing to properly train or supervise his subordinates.  He is sued in his individual capacity.

8.  Charles Morris (hereafter "Deputy Morris") is a sworn law enforcement officer and, at all times material hereto, was employed as a deputy in the Wyandotte County Sheriff's Department.  He is sued in his individual capacity.

9.  Eric Freeman (hereafter "Deputy Freeman") is a sworn law enforcement officer and, at all times material hereto, was employed as a deputy in the Wyandotte County Sheriff's Department.  He is sued in his individual capacity.

10. Rick Whitby (hereafter "Deputy Whitby") is a sworn law enforcement officer and, at all times material hereto, was employed as a deputy in the Wyandotte County Sheriff's

Department.  He is sued in his individual capacity.

11.  Unidentified deputies of the Wyandotte County Sheriff's Department could not be identified because some concealed their identities with masks and hoods; others were not known to plaintiff.  They are sued in their individual capacities.

12.  Nick Jordan (hereafter "Secretary Jordan")  is, and was at all times material hereto, the Secretary of Revenue in and for the State of Kansas.  He can be served with process at 915 SW Harrison St., Topeka, KS  66612.   He is the final policy maker for the Department of Revenue regarding the training and supervision of his employees.  As a supervisor, he may also be held liable for intentionally or recklessly failing to properly train or supervise his subordinates.  He is sued in his individual capacity.

13.  Steve Stotts (hereafter "Director Stotts") is the Director of Taxation.  He can be served with process at 915 SW Harrison St., Topeka, KS  66612.  He is the chief officer of the Taxation Division of the Department of Revenue and responsible for administration and compliance of Kansas taxes.  He is sued in his individual capacity.

14.  Carrie Purney-Crider (hereafter "Agent Purney-Crider") was, at all times relevant hereto, an agent of the Kansas Department of Revenue.  She is sued in her individual capacity.

15.  Carol Jackson (hereafter "Agent Jackson") was, at all times relevant hereto, an agent of the Kansas Department of Revenue.  She is sued in her individual capacity.

16.  Heather Wilson (hereafter "Agent Wilson") was, at all times relevant hereto, an agent of the Kansas Department of Revenue.  She is sued in her individual capacity.

## FACTS

17.  Plaintiffs, Emmett V. Jordan (hereafter "Emmett") and Amy R. Jordan (hereafter "Amy"), are husband and wife, living at 8840 Lowell in Kansas City, Kansas.  Neither has any criminal record.  There is no reason to fear violence from either of them.  At the time of the attack described below, Plaintiff  Emmett Jordan was recovering from a series of serious health issues, was overweight, and was physically incapable of resisting physical attack or posing a threat to an attacker.  J. V. J. (hereafter "minor son") is the son of Emmett and Amy Jordan.  He is fifteen (15) years of age; his birthday is December 9, 1999.

18.  On September 17, 2012, pursuant to request of the Kansas Department of Revenue, the clerk of the Wyandotte District Court issued a Writ of Execution in case no. 12 ST 69 against the property of the Plaintiffs Emmett V. Jordan and Amy R. Jordan.

19.  On September 18, 2012, at approximately 9:30 a.m., numerous and various law enforcement types, armed with automatic weapons and dressed in combat gear, including two apparent SWAT teams, descended on the Plaintiff's homestead and home.  Estimated by Emmett to be approximately eighty in number, said law enforcement officers blanketed the premises, including the roof.

20.  Inside the dwelling, Emmett and his brother Gary Jordan (hereafter "Gary"), both in their sixties, were startled by a loud commotion outside the front door.  As Emmett hurried toward the entry, he heard a loud bang as the entire front door frame was knocked down.  Emmett was confronted with a wedged phalanx of five "law enforcement officers".  All had their faces obscured with face masks,  wore body armor, and brandished automatic weapons.  They entered the home, shouting profane and largely unintelligible orders at Emmett and his brother.

21.  Both Emmett and his brother were forced to the floor, face down , knees on

5

their necks.  The officers grabbed Emmett and took him to the floor so fast and hard that Emmett

hit his face on the tile floor, which broke a back tooth.  As automatic rifles were trained on their

heads, each was handcuffed behind his back.  Repeated requests to know the identity of the

attackers and purpose of the attack were met with repeated orders to "shut up" and otherwise

ignored.  Emmett and his brother were forcibly removed from the home, despite Emmett's

protests.  Emmett asked if he was under arrest and going to jail, to which the deputy responded

that it was civil, but that he was being detained.

22.  Emmett witnessed one of the officers, fully armed with assault rifles, take his

brother, Gary, to the floor in the kitchen, causing dishes to break.  Gary was handcuffed as well.

23.  Emmett, still handcuffed, was wedged into the back of a police car.  He was

grossly overweight because of his health problems.  The heat and the compression he

experienced made breathing difficult, and he feared severe consequences to his health.  He was

kept in that car for a substantial period.  While in said car, Emmett saw what he estimated to be

twenty to forty unmarked squad cars and swat team armored car.  While unable to personally

identify many of the officers, Emmett was able to recognize, from prior acquaintance, Deputies

Eric Freeman, Rick Whitby and Charles Morris.

24.  Deputy Freeman presented Emmett with what Deputy Freeman said was a

tax warrant.  When Emmett commented that the paper "didn't even look official" and was signed

by a judge who had acted as attorney for Emmett's ex-wife in their divorce, Deputy Freeman

responded that the judge was a "good guy."  Deputy Freeman was apparently in some position of

authority over at least some of the other officers, as he showed Emmett some papers and gave

what appeared to be commands regarding their weapons.

25.  Deputy Charles Morris was personally present at the scene.  Some of his

activities included blocking vehicular and pedestrian traffic from 86th Street onto Lowell, and keeping people approximately 200 yards away from communicating with or assisting Emmett. Deputy Morris told a neighbor that  "Emmett Jordan is in custody."   The neighbor, being aware of Emmett's health condition, expressed a desire to check on and possibly help Emmett.  Deputy Morris told him he would not be allowed to have any communication or even see Emmett while he was being detained.   This neighbor observed many people dressed in camouflage military-style uniforms, carrying rifles and accompanied by armored vehicles.  This neighbor, who had served in the Marines twelve years, thought that the uniformed people looked like soldiers.

26.   Emmett saw Deputy Rick Whitby leaning against the fence with other deputies.  Deputy Whitby made eye contact with Emmett and shook his head, giving him a disapproving look.

27.   A friend of the Jordans, who received a call reporting unusual activity at the Jordan residence and requesting assistance,  left his employment and drove to the residence.  He was stopped by a Sheriff's Deputy who would not identify himself.  This Deputy told the friend he could not see Emmett, ordered the friend to move on and threatened to charge him with obstruction of justice if he did not.  It appeared to this friend that the officers were "loaded and ready to attack."   The friend stated to the deputy, "It looks like you guys are going to start a war, with all these military type assault weapons, what are you planning to do kill my friend Emmett?"  The unidentified deputy stated to the friend, "If need be."

28.   Another couple who live on Lowell Avenue were detained trying to get to their home.  They were told the activities were none of their concern.  They were fearful for their safety because of the assault rifles and the amount of officers.  The husband of the couple asked his wife and granddaughter to leave.  He stayed at home, during which time he heard yelling,

loud crashing sounds and glass breaking.  He was fearful that Emmett was not alive.

29.   After detaining Emmett's brother, Gary, for two hours, police ordered him off the property.  When he protested that he wanted to remain to see that no harm came to his brother Emmett, he was told that more harm would come to him if he did not follow the law enforcement officers' orders to leave the premises.  Emmett's brother, Gary, also has health issues.  Emmett saw his brother limping as he walked to his truck.

30.   Emmett was kept in the squad car for approximately an hour and 15 minutes. When he was released from the squad car he was forced to sit on a lawn chair, with his back to the front door of his home, unable to see the driveway.  Throughout the ensuing nine hour ordeal, Emmett was restricted to the lawn chair, outside of his house, facing away from the "service" of the writ of execution that was occurring.  His handcuffs were eventually released, but only on the condition that he remain "a good boy" and not try to leave, or even rise from, the lawn chair.  His use of a phone to call friends, relatives or counsel was initially restricted, and finally denied.  He did manage to call his wife, Amy, but his phone was seized in mid-conversation.   At one point Emmett asked if he could just go down the road a bit so he wouldn't have to watch the destruction of his home; he was told he must remain where he was.

31.   Two unidentified officers, a male in fatigue dress and a female in plain clothes began to bombard Emmett with questions.  Emmett asked them for their business cards for identification, but was told they didn't have any and that everything was under control. Shortly thereafter, three women came up to him in the lawn chair and introduced themselves as being with the Kansas Department of Revenue.   The first such woman introduced herself as "Carrie."  She said, "The three of us are here to take everything of value."  Emmitt asked this woman where Cindy Frost was, as that was the KDOR agent he had been working with.   Carrie,

8

now known to be defendant Deputy Carrie Purney-Crider, responded, "I am above Cindy Frost." Deputy Purney signed documents connected with the seizure, including Property Custody Receipts listing some of the items seized.  The other two KDOR agents present were Deputy Heather Wilson, who signed a currency count statement, listing her number as 115, and Deputy Carol Jackson, who also signed the currency count statement, listing her number as 108.

32.   Having deduced that the officers wanted access to his property, Emmett alerted them to the fact that keys to all locks on the premises were located on a board just inside the front door of the house.  The keys were labeled and organized, and could be used to access any room, building, vehicle, or cabinet on the premises, thereby eliminating the necessity to damage or destroy any property to which the officers desired access.

33.   Agent Purney-Crider located the keys; at one point she held the keys up for Emmett to see and shook them back and forth before him.  Shortly after that, Emmett heard glass breaking.  He tried to stand up to see what was going on, but was told to sit down or be hand cuffed. When he inquired of deputies why windows were being broken when he had provided keys to everything, he was told to be quiet.

34.   Instead of employing the keys, or some reasonable means of gaining access to various enclosures, the law enforcement officers "trashed" the premises, breaking windows and damaging doors.  The wires to surveillance equipment in the house were cut and left dangling. All surveillance equipment was taken.

35.   Emmett heard hammering sounds from the direction of his daughter's motor home.  He inquired of a deputy as to why they were doing this.  Emmett had provided keys, the motor home was tagged and registered to his daughter, and there was no need for destruction. Again, he was told to be quiet.

36.   Emmett witnessed a man, later identified as Eric Bloomquist, an auctioneer with Blomquist Realty and Auction, Inc., load up equipment on flatbed trailers, some of which equipment belonged to third parties, including his minor son.  Although duct tape obscured the lettering on the truck, it was apparent that items were being loaded at the direction of the Kansas Department of Revenue agents and with the assistance of the law enforcement officers.   The property belonging to  Emmett and/or Amy Jordan that was seized had a value far in excess of $46,989.10, the amount of the Department of Revenue's judgment against Mr. and Mrs. Jordan.

37.   Property seized included personal property which belonged to Emmett's daughter, Amy Hover, and to his minor son, J.V.J., a plaintiff herein.   The property belonging to Emmett's daughter is the subject of another lawsuit.  The property belonging to plaintiffs' son, J.V.J., included a valuable coin collection, many toys and collectibles, all of which were precious to the minor son.  Protests that some of the property taken belonged to plaintiffs' minor son and daughter were ignored.

38.   There was a large number of unidentified sheriff's deputies and/or other law enforcement types present,  dressed in military-looking garb,  carrying long rifles and other weapons, who milled about the premises.  Because Emmett's view of the proceedings was largely blocked, being forced to sit in a chair facing away from his property, it was impossible for him to differentiate all of the individual depradations committed by individual law enforcement types, or to identify most of the perpetrators.  It is impossible for Emmett to isolate the unconstitutional acts each unidentified defendant committed.  Various law enforcement officers amused themselves driving dirt bikes and ATVs around his property.  All law enforcement officers present apparently approved the behavior, and none made any move to stop it.

39.  Emmett was eventually confronted by Agent Purney-Crider, who forcefully commanded him to sign some papers.  When he refused, she threw the papers in his face.

40.  Agent Purney-Crider stated to Emmett that she was going to see that he was criminally charged for holding vehicles that belonged to someone else, apparently referring to the vehicles belonging to third parties which she had ordered seized.

41.  Agent Purney-Crider demanded the combination to Emmett's safe.  She told him that if he did not provide it, she would have the safe ripped open.

42.  At some point during the ordeal, Agent Purney-Crider told Emmett "I will destroy you."

43.  Despite attempts to prevent Emmett from observing the activities going on in his property, he observed KDOR agents Purney-Crider, Wilson and Jackson physically carrying items from his home and encouraging and directing others present, including the auctioneer and law enforcement officers, in taking and damaging his property as described herein.

44.  Law enforcement officers finally began to leave around 6:30 p.m.  The premises had been "trashed".  The front door to the home was broken, with no way to shut or lock it.  Glass had been broken, walked on, and dragged throughout the house.  Empty water bottles and food wrappers were thrown randomly throughout the grounds, including the interior of the home.  Dresser drawers were broken, with their contents strewn about.  All bedrooms, including J.V.J.'s bedroom, had been ransacked.  Their clothes were strewn everywhere.  Emmett's minor son's personal items had apparently been stolen, including money and heirlooms given to him by his grandparents.  Piles of items that apparently agents and law enforcement officers ran out of time or energy to seize were left in the living room, simply thrown on the floor.  The mattress in J.V.J.'s bedroom was cut.  The house was full of flies.

45.  A miniature race car collection belonging to the minor son had been stolen. These were collector's items, all having been personally autographed to the minor son by over one hundred race car drivers.

46.  The KDOR agents' written report, signed by Agent Carol Jackson and  Agent Heather Wilson, showed a total of $61 and miscellaneous currency was taken.  Emmett had over $200 on his person, which was taken; in addition, a valuable coin collection was taken; as well as a large bank full of quarters.   None of this was reported.

47.  Emmett's daughter's motor home had been broken into, with the door damaged to the point that it wouldn't close.  Her other vehicles had been left by law enforcement officers with the doors left open and dome lights on, causing the batteries to go dead.  The doors and windows  to Emmett's home had been broken or left open, and the house was swarming with flies and insects.  When Emmett finally tried to go to bed, he realized that law enforcement officers had destroyed his CPAP machine mask, making it impossible for him to sleep.

48.  Emmett stayed up until 5:00 a.m. trying to clean up the mess.  Over a month later, he and his wife were still trying to clean up and repair the damage.

49.  When Emmett complained to deputies and agents about the treatment set out above, he was repeatedly told "I am just doing my job."

50.  As set forth in individual paragraphs above, all of the deputies and agents, identified and unidentified, including DOR Agents Purney-Crider, Jackson and Wilson, and Deputies Freeman, Morris and Whitby, and those as yet unidentified, were present during the entire ordeal.  They all witnessed the treatment of Emmett and his brother, Gary.  They all had the opportunity to intervene.  In particular, agents Purney-Crider, Jackson and Wilson (a) had to go through the roadblock at 86th and Lowell, past armored vehicles and numerous heavily armed

military looking state actors, to confront Emmett on his property; (b) addressed Emmett, as he was restrained in his lawn chair; (c) told him they were there to "take everything of value"; (d) actually carried items from the house; (e) assisted and directed the apparent auctioneer and other law enforcement agents in seizing and loading items of property; (f) observed the law enforcement personnel amusing themselves by riding four-wheelers and dirt bikes on the property; and were aware of, and in the case of Agent Purney-Crider, in particular, encouraged the property destruction set out herein. Deputies Freeman, Morris, Whitby and unidentified deputies restrained Emmett as set forth above, denied neighbors access to the premises or information about Emmett's condition, as set forth above, served papers on Emmett, either actively participated or acquiesced in the destruction of property and amused themselves, all as set forth above.

51. Plaintiffs were notified that an auction would be held; however, the notice was received on or shortly after the date of the auction. To plaintiffs' information and belief, the auction of their property was held in McPherson County or vicinity.

52. Although a partial list of items taken was provided, it was largely illegible. Plaintiffs have never received an accounting listing the items taken, the items sold, the amount received for the items at auction, or the amount applied to the warrant amount. Items belonging to third parties have not been returned.

53. No return of the writ of execution was made as provided by Kansas law, including K.S.A. 60-2401, neither by Sheriff Ash nor anyone else. No return of the sale of the items seized was made, nor court confirmation of the sale of the levied property sought or received, as provided by Kansas law, including K.S.A. 60-2415, neither by Sheriff Ash nor anyone else; thus, there was no opportunity for the court to exercise its equitable powers to

confirm or deny the sale as contemplated by Kansas law, including K.S.A. 60-2415 (b).

54.     By the actions set out above, the Unified Government and the Department of Revenue jointly engaged in an enterprise which each wanted to succeed.  In so doing, employees of the Department of Revenue, including the identified agents, Purney-Crider, Wilson and Jackson, assisted law enforcement personnel in the execution of the writ; likewise, law enforcement personnel, including Sheriff Ash and his identified and unidentified deputies, assisted the Department of Revenue in seizing the property of plaintiffs.

55.  Since the incident Plaintiffs have suffered continuing emotional and mental distress; have had trouble sleeping; and have continued to feel embarrassed and humiliated in their neighborhood.  Emmett's children are afraid to visit him at his home and wouldn't allow their children to come for Holidays.

56.  To plaintiffs' knowledge and belief, none of the agents and officers who participated in the raid and seizure, including KDOR agents Purney-Crider, Jackson and Wilson, and Sheriff's Deputies Freeman, Whitby, Morris and/or those unidentified deputies, received discipline or supplemental training  in the months following the execution of the writ.  The failures of Sheriff Ash, Director Stotts and Secretary Jordan to discipline or train their subordinates, indicate that they ratified their subordinates' behavior.

57.  In 2012, in Wyandotte County, defendants routinely failed to properly file returns on writs and/or seek confirmation of the sale of property seized in other cases.

**Count I**

**Claim against Defendants Deputies Charles Morris, Eric Freeman, Rick Whitby, other as yet unidentified deputies, officers, agents and employees of the Wyandotte County Sheriff's Department, Agents Carrie Purney-Crider, Carol Jackson and Heather Wilson Pursuant to 42 U.S.C. sec. 1983 and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution For Unconstitutional Detention and Use of Excessive Force**

58.  Plaintiffs incorporate by reference the allegations contained above as though set forth in full herein, and state as follows:

59.  Acting under color of state law, defendants Charles Morris, Eric Freeman, Rick Whitby,  unidentified deputies and agents of the Wyandotte County Sheriff's Department, Carrie Purney-Crider, Carol Jackson and Heather Wilson, Agents of the Kansas Department of Revenue, violated Plaintiffs' constitutional rights; they encouraged, permitted, performed, directed, endorsed and/or acquiesced in the violation of the constitutional rights of Plaintiffs as set out above.  All defendants named in this Count I were deliberately and recklessly indifferent to such constitutional violations.  Despite witnessing and having a duty to intervene and prevent the constitutional violations, none intervened or attempted to stop the activities taking place during the execution of the writ.

60.  Nothing occurred during the seizure of plaintiffs' property to suggest that any of them posed any danger whatsoever to law enforcement.  Plaintiff Emmett Jordan, who was present during the seizure, was fully compliant throughout the search and attempted to allow access to his premises by pointing out where the keys were, which could have avoided forcible entry and prevent damage.

61.  The unconstitutional acts of the defendants named in this Count I include, but are not limited to:

(a)  the unnecessary detention of individuals incident to the service of process, including tax warrants and writs of assistance.

(b)  employing grossly excessive force, including:

(i)  Aggravated assault with deadly weapons

(ii)  Concealment of identity

(iii)  Battery and aggravated battery

(iv)  Criminal damage to property

(v)  False imprisonment

(vi)  Vandalism

(vii)  Theft

(viii)  Terroristic threat

(ix)  Abuse of process

(x)  Deprivation of property without due process

(xi)  Deprivation of property without just compensation

(xii)  Defamation

(xiii)  Negligent and reckless infliction of personal injury

(xiv)  Infliction of emotional distress

62.  As a direct and proximate result of this violation of plaintiffs' rights, plaintiffs have suffered damages, including, but not limited to:  loss of property, consequential damages, loss of reputation and emotional distress.

63.  As a direct and proximate result of defendants' actions and failures to act, as set forth in this Count II, plaintiffs and each of them have been damaged in an amount in excess of $75,000.00.

## Count II

### Claim Against All Defendants Pursuant to 42 U.S.C. sec. 1983 and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution For Deprivation of Property Without Due Process of Law

64.  Plaintiffs incorporate by reference the allegations contained above as though set forth in full herein, and state as follows:

65.   The defendants intentionally violated the civil rights of Plaintiff J.V.J. by their willful disregard to Plaintiff's property rights.  The seizure of property belonging to Plaintiff J.V.J. and sale of the same amounted to the deprivation of property in violation of the Fourth, Fifth and Fourteenth Amendments.

66   As a direct and proximate result of this violation of Plaintiff's rights, Plaintiff J.V.J. has suffered damages, including, but not limited to:  loss of property, consequential damages, loss of reputation and emotional distress.

67.   As a direct and proximate result of defendants' actions and failures to act, as set forth in this Count III,  Plaintiff J.V.J. has been damaged in an amount in excess of $75,000.00.

### Count III

**Claim Against Defendants Wyandotte County Sheriff Don Ash,**
**Nick Jordan, Secretary of the Kansas Department of Revenue**
**and Steve Stotts, Director of Taxation**
**For an Accounting of Property Received, Disposition of Property,**
**Amounts Received from Sale of Property,**
**And Application of Proceeds**
**And an Order Requiring the Filing of Returns**
**Pursuant to Kansas Law**

68**.**   Plaintiffs incorporate by reference the allegations contained above as though set forth in full herein, and state as follows:

69.   The value of property seized was far in excess of the amount of the tax warrant.

70.   Some of the property seized belonged to third parties.

71.   Plaintiffs have never received an accounting relating to the disposition of the property

72.  No return of the execution of the warrant or a return of the sale was filed as required by Kansas law, nor was confirmation of the sale by a Court sought, also as required by Kansas law, specifically, Article 60, Chapter 24 of the Kansas Statutes Annotated.

73.  The actions and failures to act violated Plaintiffs' rights under the Fourth, Fifth and Fourteenth amendments to the United States Constitution and also violated the law of the State of Kansas.

74.  As a direct and proximate result of defendants' actions and failures to act, as set forth in this Count I, plaintiffs and each of them have been damaged in an amount in excess of $75,000.00.

### Prayer for Relief

Wherefore, Plaintiffs pray:

A.   That judgment be rendered in favor of Plaintiffs and against Defendants on all causes of action asserted herein;

B.   That Plaintiffs be awarded those compensatory damages to which they are entitled for deprivation of their civil rights, their physical and mental pain and suffering, past, present and future, loss of enjoyment of life, loss of their personalty, and medical expenses, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

C.   That Plaintiffs be awarded expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C. sec. 1988(b) and (c).

D.   That Plaintiffs be provided with an accounting of the property seized,

its disposition and application of the proceeds.

E.  That the appropriate defendants be ordered to file returns of the execution

of the Writ and the sale of the property seized as required by Kansas law.

F.  That Plaintiffs receive such other and further relief as is just.


**Jury Demand**

Come now Plaintiffs and demand trial by jury.


WILKES & DUNN


By_/s/William F. Dunn_____
  William F. Dunn – S. Ct. #9522
  Roberta L. Wilkes – S. Ct. #9610
  831 Armstrong
  Kansas City, Kansas 66112
  (913)299-0229; (913) 342-7073(fax)
  wilkesanddunn@earthlink.net
  robertaesq@earthlink.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of February, 2015, I electronically filed the foregoing Second Amended Complaint with the clerk of the court by using the CM/ECF system, which will send a copy to:

Jennifer Conkling-Bates
Kansas Department of Revenue
Legal Services Bureau

J. Brian Cox
Kansas Department of Revenue
Legal Services Bureau

*Attorneys for defendants, Kansas Department of Revenue, Nick Jordan, Steve Stotts, Carrie Purney-Crider, Heather Wilson and Carol Jackson*

And to

Henry E. Couchman, Jr.
Unified Government of Wyandotte County/Kansas City, Kansas
Legal Department

*Attorneys for Defendants, Unified Government, Don Ash, Charles Morris, Eric Freeman and Rick Whitby.*

/s/ William F. Dunn – 
William F. Dunn – Ks. S. Ct. #9522

20