## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Emmett V. Jordan and Amy R. Jordan,**
**individually and as natural parents of**
**J.V.J., a minor;**

**Plaintiffs,**

**v.**                                    **Case No. 14-2539-JWL**

**Charles Morris, Eric Freeman**
**and Rick Whitby,**

**Defendants.**

## <u>MEMORANDUM & ORDER</u>

Plaintiffs Emmett V. Jordan and Amy R. Jordan, individually and on behalf of their minor child, filed this lawsuit under 42 U.S.C. § 1983 alleging violations of their Fourth, Fifth and Fourteenth Amendment rights in connection with the seizure and subsequent sale of plaintiffs' property to satisfy the tax indebtedness of plaintiffs Emmett and Amy Jordan, delinquent taxpayers. The tax warrant was executed by agents of the Kansas Department of Revenue and the Wyandotte County Sheriff's Department. After previous motion practice, only three defendants remain in the case—Charles Morris, Eric Freeman and Rick Whitby, all of whom were employed as deputies with the Wyandotte County Sheriff's Office and were present on the scene when the warrant was executed. This matter is presently before the court on defendants' motion for summary judgment on plaintiffs' remaining claims. As will be explained, the motion is granted.

## I.    Facts

Consistent with the applicable standard, the following facts are uncontroverted.[1]   In September 2012, defendants Charles Morris, Eric Freeman and Rick Whitby were employed as deputies with the Wyandotte County Sheriff's Office.  Deputy Morris was the "tax deputy" and frequently worked with employees of the Kansas Department of Revenue (KDOR) who were charged with collecting delinquent taxes.  Deputy Freeman was responsible for supervising patrol deputies on the day shift.  Deputy Whitby was the Chief Deputy for the Sheriff's Office.  All defendants had served with the Sheriff's Office for at least 25 years.    Plaintiff Emmett Jordan volunteered as a reserve deputy with the Sheriff's Office from 1982 to 1990 and he knew Deputies Morris, Freeman and Whitby from his service as a reserve deputy.  As a reserve deputy, Mr. Jordan was a firearms instructor for the Sheriff's Office.

In January 2012, the KDOR filed a tax warrant in the District Court of Wyandotte County, Kansas.  The warrant indicated that plaintiffs Emmett and Amy Jordan owed $44,875.44 in sales tax (from a business they owned) for the period from October 2009 to March 2010 and January 2011 to March 2011.  On September 17, 2012, the KDOR requested that the Clerk of the District Court issue a writ of execution directing the sheriff to execute and levy the tax warrant against the Jordans' property in Kansas City, Kansas.  That same day, a Wyandotte County district judge signed the writ of Execution.  The writ listed the property that was subject to seizure and included 20 specific vehicles and "any other real or personal property owned by

---

[1] In their memorandum in support of their motion for summary judgment, defendants set forth 91 separate statements of fact with citations to the record.  Plaintiffs have not controverted any of these facts in any fashion—they simply add their own facts "in addition to the Facts asserted by defendants."  Each fact, then, is deemed admitted.  *See* D. Kan. Rule 56.1(a).

the defendant(s)."[2]  The writ commanded the sheriff to enter the property "by whatever force is necessary, including but not limited to the use of a locksmith, for the purpose of searching for, locating and taking possession of said property."  The writ further commanded the sheriff to "take possession of the above described property and immediately deliver it to [the KDOR] for sale in satisfaction of the underlying tax warrant."

When Deputy Morris learned that the KDOR was going to seek the writ of execution, he told his superiors that he was concerned that Mr. Jordan might resist the seizure of his property.  This concern was based on Deputy Morris's belief, formed based on Deputy Morris's prior dealings with Mr. Jordan, that Mr. Jordan was a "sovereign citizen."  While Mr. Jordan denies that he is a "sovereign citizen," he testified at his deposition that he participated in meetings with persons involved in an organization known as the Republic of the United States, had been to that organization's website, and shared its political tenets.  Deputy Morris averred that he began reading articles about sovereign citizens in law enforcement publications and on the internet after the media reported in May 2010 that a father and son, both sovereign citizens, had shot and killed two West Memphis, Arkansas police officers during a traffic stop.  Deputy Morris also knew that Mr. Jordan possessed a large number of firearms and was skilled in their use; that he had posted his property and the posting expressly forbid governmental agents from entering the property; that the entrance to his driveway was chained; and that he had video surveillance on his property.  Mr. Jordan confirmed in his deposition that four working surveillance cameras were placed on the roof on his house and that he kept the entrance to the

---

[2] Mr. Jordan routinely had numerous vehicles on his property.  Moreover, the property included a main house plus several outbuildings, including a two-car garage, a 40 x 60-foot steel building behind the house, and other smaller structures.

property chained.  It is also undisputed that his property was posted and the sign specifically forbid government agents from entering the property.  For these reasons, Deputy Morris was concerned about the safety of deputies and KDOR employees if Mr. Jordan resisted the seizure of his property.  Deputy Whitby was also aware of the May 2010 incident in West Memphis, Arkansas and he averred that the Federal Bureau of Investigation had sent out flyers to law enforcement agencies warning those agencies about the danger that sovereign citizens potentially posed to law enforcement.  Deputy Whitby, therefore, also believed that there was a reason for concern with respect to executing the writ.

For the safety of the deputies and KDOR employees, the Sheriff's department decided to have a tactical unit known as the Sheriff's Emergency Response Team (SERT) on stand-by during the service of the writ in case Mr. Jordan resisted the seizure of his property or it was necessary to use force to gain entry to the property.  On the morning of September 18, 2012, the plan for service of the writ was discussed at a briefing.  That plan called for Deputy Freeman and Deputy David Toland to walk up plaintiffs' driveway and knock on the front door of the house.  If plaintiffs were cooperative, employees of the KDOR would then enter and commence seizing plaintiffs' property.  If plaintiffs resisted the seizure or if force was needed to access the property, Deputy Toland or Deputy Freeman would summon SERT, which would be stationed nearby.

At approximately 10:00am on September 18, 2012, Deputies Freeman and Toland approached plaintiffs' house and knocked loudly on the front door.  After receiving no response, Deputy Freeman walked around to the back of the house but did not see anyone.  SERT was summoned, formed up at the front door of the house, and forcibly entered the house at

approximately 10:30am.  Plaintiff Emmett Jordan and his brother, Gary Jordan, were inside the house at the time.  Mr. Jordan testified that he was in the bathroom when the officers arrived and that he did not hear the knock at the door.  Members of the SERT team forced plaintiff Emmett Jordan to the ground and handcuffed him.  They then lifted him to his feet, took him outside, and placed him in the back of a patrol car.  Deputy Freeman remained outside at all times and played no part in removing Mr. Jordan from the home or placing him in the patrol car.  Deputies Morris and Whitby were not present at this time.[3]

According to Mr. Jordan, he remained in the backseat of the patrol car for approximately 75 to 90 minutes.[4]  Deputy Freeman then removed Mr. Jordan from the patrol car, located a lawn chair for Mr. Jordan, moved the handcuffs from back to front, and asked Mr. Jordan if he wanted water and/or medical attention.  Mr. Jordan declined.  Mr. Jordan sat in the lawn chair, facing the house, for the remainder of the day.[5]  In the meantime, the SERT team cleared the house, the outbuildings and the vehicles on the property.  The team then did a second clearance. In the house, members of the SERT team found a loaded handgun in the room where Mr. Jordan was encountered.  Members of the SERT team also found numerous loaded firearms in an RV located on the property.  After SERT finished clearing the property, Mr. Jordan's handcuffs were removed.  After downing their rifles and gear, members of the SERT team took turns

---

[3] While Mr. Jordan submits additional facts concerning his initial encounter with the SERT team, those facts are not relevant to the motion because the named defendants were not present at that time.  Indeed, the court has previously held that Deputies Morris, Freeman and Whitby are entitled to qualified immunity as to claims stemming from any conduct that occurred inside the home upon initial entry because the named defendants were not present at that time.

[4] While the deputies do not agree that Mr. Jordan was detained for that length of time, they concede as much for purposes of summary judgment.

[5] The evidence reflects that Mr. Jordan was offered the opportunity to go inside the house to use the restroom but he declined.

sitting with Mr. Jordan.  After the property had been cleared, KDOR employees, as well as an auctioneer under contract with the KDOR, entered the property to inspect and seize plaintiffs' personal property and to load it onto trucks.  The KDOR seized 15 rifles, 15 handguns, over 7500 rounds of ammunition, and other property including vehicles, motorcycles, and business equipment.   KDOR agents did not complete their work and leave the premises until approximately 6:30pm.  Plaintiff Amy Jordan and the Jordans' minor son were not present at any time during the execution of the writ.

It is undisputed that Mr. Jordan was not permitted to walk around the property unsupervised while agents were inspecting and seizing property.  In other words, to the extent Mr. Jordan remained on the property, he was essentially restricted to sitting on the lawn chair. Deputy Morris, Deputy Freeman and Deputy Whitby all averred that they believed it was reasonable to restrict Mr. Jordan's movement on the premises both for the safety of deputies and KDOR agents (in light of the firearms that had been discovered) and so that KDOR employees could do their jobs without interference.  Plaintiffs do not challenge these assertions.  There is some dispute about whether Mr. Jordan was free to leave the premises if he so desired.  Mr. Jordan testified that, on one occasion, he asked a deputy (not a named defendant) whether he could leave the property and he was advised that he could not leave.  It is undisputed that Mr. Jordan never asked any of the named defendants whether he was free to leave and none of the named defendants ever told Mr. Jordan that he was not free to leave.

Deputy Whitby avers that he believed that Mr. Jordan was free to leave the property and he did not hear anyone advise Mr. Jordan (or anyone else) that Mr. Jordan was not free to leave the premises.  Deputy Whitby's responsibilities that day consisted primarily of supervising the

deputies who were assigned to monitor traffic on the road running to the property and to secure the perimeter of the property.  Deputy Whitby, then, spent most of the time near the street at the end of the driveway.  He left the property at noon and did not return.  Mr. Jordan testified that he never spoke with Deputy Whitby that day.  Deputy Whitby played no role in determining what property to seize and was unaware of whether the KDOR had seized property belonging to plaintiffs' minor son.

Deputy Freeman averred that he had no knowledge of whether Mr. Jordan was free to leave the premises.  According to Deputy Freeman, his supervisors never indicated to him that Mr. Jordan was not free to leave and he did not hear anyone tell Mr. Jordan that he could not leave.  Deputy Freeman averred that Mr. Jordan never asked him whether he could leave and he did not hear Mr. Jordan ask anyone else whether he could leave.  The only interaction that Deputy Freeman had with Mr. Jordan on that day (after removing him from the patrol car and finding the lawn chair) was bringing Mr. Jordan a McDonald's hamburger and a Coke.  Deputy Freeman spent much of the day checking on Mr. Jordan and the deputies and making sure that everyone was sufficiently hydrated.  Deputy Freeman remained on the property until the KDOR agents finished their work.  Deputy Freeman played no role in determining what property to seize and was unaware of whether the KDOR had seized property belonging to plaintiffs' minor son.

Deputy Morris averred that he had no reason to believe that Mr. Jordan could not leave the premises if he wished.  He further averred that Mr. Jordan did not ask him whether he could leave—and Mr. Jordan testified that he has no recollection of speaking to Deputy Morris at all— and Deputy Morris never heard anyone tell Mr. Jordan that he was not free to leave the

premises.   After monitoring traffic on the street leading to plaintiffs' property that morning, Deputy Morris entered the property at approximately 11:00am and spent the rest of the day accompanying KDOR employees as they seized property.   Deputy Morris remained on the property until the KDOR agents finished their work.   He played no role in determining what property to seize and was unaware of whether the KDOR had seized property belonging to plaintiffs' minor son.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014); *see* Fed. R. Civ. P. 56(a).   A factual dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*   A factual issue is material "if under the substantive law it is essential to the proper disposition of the claim."   *Id.*   The nonmoving party "is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143–44 (10th Cir. 2013).

When, as here, the defendants have asserted qualified immunity at the summary judgment stage, the court's factual analysis relative to the qualified-immunity question is distinct:

> [T]he objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court.

*Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015). (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)).   The "universe of facts" is comprised of uncontested facts and contested material facts favorable to the party claiming injury.   *Weigel v. Broad*, 544 F.3d 1143, 1156 (10th Cir.2008) (O'Brien, J., dissenting).   After the universe of relevant facts is distilled from the record, the court determines whether those facts "demonstrate" the violation of a clearly established constitutional right. *Id.*


## III.    Unlawful Seizure and Detention

In the pretrial order, plaintiff Emmett Jordan asserts that the named defendants violated his Fourth Amendment rights by unlawfully seizing and detaining him in the patrol car and then "restricting" him to the lawn chair on his property.   In the alternative, Mr. Jordan contends that the named defendants had the opportunity to intervene to stop the alleged constitutional violations from occurring but failed to do so.   The named defendants each assert a qualified immunity defense.   Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"   *Thomas v. Durastanti*, 607 F.3d 655, 661 n.4 (10th Cir. 2010). When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the

plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)). The court maintains the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). If the plaintiff, however, fails to establish a violation of the law, then the court need not reach the issue of whether the law was clearly established. *Reynolds v. Powell*, 370 F.3d 1028, 1029 (10th Cir. 2004).

A.      *Alleged Detention on Lawn Chair*

Mr. Jordan asserts in his summary judgment response that he was "detained" in a lawn chair for more than 6 hours while agents seized his property. While he does not contend that any of the named defendants personally participated in that detention,[6] he contends that the named deputies had an opportunity to stop the detention and failed to do so. *See Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (law enforcement officer has a duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers); *Lusby v. T.G.&Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984) ("[A]lthough [officer] was not liable merely because he was present at the scene of a constitutional violation, . . . he may be liable if he had the opportunity to intervene but failed to do so.").

---

[6] It is undisputed that none of the named defendants took any affirmative act to restrict Mr. Jordan's movement or indicate that he was not free to leave.

In support of their qualified immunity defense, defendants assert that there is no evidence that any of the defendants had knowledge that Mr. Jordan had been detained in the chair and was not free to leave the property such that Mr. Jordan cannot establish a constitutional violation on the part of the defendants.  The court agrees.  Viewing the evidence in the light most favorable to Mr. Jordan, one unidentified deputy or agent advised Mr. Jordan that he could not leave the property and was required to remain in the lawn chair.  Assuming that this detention violated Mr. Jordan's Fourth Amendment rights (an issue which the court need not resolve and on which the court expresses no opinion), the named defendants are not liable for that violation in light of the undisputed facts.  Significantly, it is undisputed that none of the named deputies had any knowledge that Mr. Jordan was advised that he could not leave the property or any knowledge that Mr. Jordan was in fact not permitted to leave the property.  Deputy Whitby and Deputy Morris averred that, as far as they were concerned, Mr. Jordan was free to leave the property. Deputy Freeman averred that he did not know whether Mr. Jordan was free to leave but that his supervisors never indicated to him that Mr. Jordan was not free to leave.  Mr. Jordan fails to controvert any of these facts.[7]  On this record, then, there is simply no evidence that the named

---

[7] In an apparent attempt to demonstrate that Deputy Morris understood that Mr. Jordan was not free to leave, Mr. Jordan submits the affidavit of Dan Gilyeat, a friend who encountered Deputy Morris on the street and stopped to ask about Mr. Jordan's welfare.  Defendants ask the court to strike the affidavit and the court does so.  Mr. Gilyeat was never disclosed as a witness; discovery has closed; and Mr. Jordan has not shown that his failure to disclose Mr. Gilyeat as a witness was substantially justified or harmless.  *Clean Harbors, Inc. v. CBS Corp*., 875 F. Supp. 2d 1311, 1315-16 (D. Kan. 2012).  But even if the court considered the affidavit, it does not demonstrate that Deputy Morris believed that Mr. Jordan was detained on the lawn chair. According to Mr. Gilyeat, Deputy Morris told Mr. Gilyeat that Mr. Jordan "is in custody, for now."  This purported conversation necessarily occurred prior to 11:00am (at which time Deputy Morris ceased monitoring traffic and entered the property himself) and it is undisputed that Mr. Jordan was in custody (in the back of the patrol car) at that time.

defendants had any knowledge of a constitutional violation and, accordingly, summary judgment is required on plaintiffs' theory that the named defendants failed to intervene in the lawn chair detention of Mr. Jordan. *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (plaintiff cannot survive summary judgment on failure-to-intervene theory without showing that defendants had knowledge of a constitutional violation).

Aside from his claim that he was detained in the lawn chair and was not free to leave the property, Mr. Jordan seems to separately claim that his Fourth Amendment rights were violated by the restriction on his movement around his own property while KDOR agents executed the warrant. While none of the parties address whether this limitation on Mr. Jordan's movement, standing alone, constitutes a seizure for purposes of the Fourth Amendment, the court assumes that Mr. Jordan was "seized" when he was prevented from freely moving about his property, regardless of whether he was free to leave the property. *See Lundstrom v. Romero*, 616 F.3d 1108, 1123-24 (10th Cir. 2010) (individual was seized for purposes of the Fourth Amendment when he complied with officers' orders to leave his house); *Silvan W. v. Briggs*, 309 Fed. Appx. 216, 226 (10th Cir. 2009) ("Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to remain somewhere, by virtue of some official action."). As with Mr. Jordan's detention claim, there is no evidence that any of the named deputies personally participated in the decision to restrict Mr. Jordan's movement on the property or actively restricted his movement. But because it is undisputed that the named defendants knew that Mr. Jordan's movement around the property was restricted, Mr. Jordan

contends that they are liable a violation of his Fourth Amendment rights based on their failure to intervene to protect those rights from infringement by other officers.

To survive summary judgment on his failure-to-intervene theory, Mr. Jordan must raise a genuine issue of material fact as to an underlying constitutional violation. *See Jones v. Norton,* 809 F.3d 564, 576 (10th Cir. 2015) ("We are unaware of any failure to intervene case in which this court has reversed either a grant of summary judgment or qualified immunity to a government actor without first finding at least a genuine issue of material fact as to an underlying constitutional violation."). To establish a Fourth Amendment violation based on the officers' restriction of Mr. Jordan's movement around his property, Mr. Jordan must establish that the seizure was unreasonable. *Bradford v. Wiggins*, 516 F.3d 1189 (10th Cir. 2008). In determining reasonableness, the court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Weigel v. Broad*, 544 F.3d 1143, 1162 (10th Cir. 2008). The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001).

Mr. Jordan does not dispute that each of the named defendants in this case subjectively believed that it was reasonable to restrict Mr. Jordan's movement around the property, both for the safety of the officers and the KDOR agents (in light of the large number of firearms that had been located on the property—many of them loaded—and the concern that additional firearms existed that had not been uncovered) and so that the KDOR employees could do their jobs

without interference. The subjective beliefs of the named defendants, however, are irrelevant. *United States v. Madrid*, 713 F.3d 1251, 1257 (10th Cir. 2013) ("An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action.") (quoting *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)).   Here, regardless of the deputies' beliefs, the duration and extent of the restriction on Mr. Jordan's movement was objectively reasonable in light of all the circumstances known to the deputies at the time.

The court begins with the fact that Mr. Jordan's movement was restricted during the execution of a valid warrant.[8]   To be sure, the duration and extent of the restriction on Mr. Jordan's movement would have been permissible in the "distinct but more common context of executing a warrant for criminal contraband."   *See Bray v. Planned Parenthood Columbia-Williamette, Inc*., 746 F.3d 229, 238 (6th Cir. 2014).   In that context, the Supreme Court has approved of confinement by officers of the occupants of a house to minimize the risk of bodily harm during the execution of the warrant, to facilitate the orderly completion of the search, and to prevent flight and the improper disposal of evidence.   *See Michigan v. Summers*, 452 U.S. 692 (1981) (officers executing a search warrant have the authority to detain the occupants of the premises while a proper search is conducted); *Muehler v. Mena*, 544 U.S. 93, 99-100 (2005) (detention in handcuffs for the duration of two-to three-hour search was reasonable under *Summers*).   In fact, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'"   *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19).

---

[8] Mr. Jordan does not challenge the validity of the warrant in any respect.

Because the rule is categorical, Mr. Jordan's detention for the duration of the search would have been reasonable in the criminal context because a warrant existed to seize property at the address and Mr. Jordan was an occupant at that address at the time the warrant was executed. *See id.*

The court believes that two of the three governmental interests underlying *Summers* apply with equal force under the particular facts of this case despite the fact that officers were executing a tax warrant in the civil context.[9]  Restricting Mr. Jordan's movement on his property to minimize the risk of harm to the officers and KDOR agents was reasonable in light of the facts known to the named defendants prior to the execution of the warrant and the facts that became known to them while Mr. Jordan was detained in the patrol car.  Deputy Morris believed that Mr. Jordan was a sovereign citizen; he and Deputy Whitby were both aware of at least one violent incident between sovereign citizens and law enforcement officers; the FBI had specifically warned law enforcement agencies about the danger that sovereign citizens potentially posed to law enforcement; the named defendants knew that Mr. Jordan possessed numerous firearms and was skilled in their use; and Deputy Morris knew that Mr. Jordan had posted his property to forbid governmental agents from entering the property; that the entrance to Mr. Jordan's driveway was chained; and that Mr. Jordan maintained video surveillance on his property.  Once on the property, the SERT team discovered a loaded handgun in the room where Mr. Jordan was encountered; a total of 15 rifles and shotguns on the property (some loaded); a

---

[9] The third governmental interest identified in *Summers* concerned the risk of flight.  That concern is not implicated here, where the named defendants undisputedly did not attempt to detain Mr. Jordan on the property and believed that he was authorized to leave the property if he desired.

total of 15 handguns on the property (some loaded); and more than 7500 rounds of ammunition. In these circumstances, it was reasonable for the SERT team to limit Mr. Jordan's movement around the property for the safety of the officers, the KDOR employees and Mr. Jordan himself while KDOR employees executed the warrant. The restriction further facilitated the orderly completion of the execution of the warrant—a task that took more than 6 hours to complete even without any interference from Mr. Jordan.[10]   Moreover, turning the lens back to the named individuals in this case, the record is devoid of any evidence suggesting that any of the named defendants—who undisputedly had no involvement in determining how long to restrict Mr. Jordan's movements—should have taken some action to end the restriction on Mr. Jordan's movement sooner.

Finally, the court finds that even if the restriction on Mr. Jordan's movement constitutes an unreasonable seizure for purposes of the Fourth Amendment, the court nonetheless would grant qualified immunity to the named defendants. Specifically, the court concludes that Mr. Jordan's Fourth Amendment rights in the context of a civil writ of execution were not so "clearly established" such that a reasonable person in the position of the named defendants would have been aware that the seizure of Mr. Jordan was unconstitutional when it occurred. *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008). Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Poolaw v. Marcantel*, 565 F.3d 721, 733 (10th Cir. 2009). The plaintiff is

---

[10] Mr. Jordan does not contend that KDOR employees took an unreasonable amount of time to execute the warrant or that they unnecessarily prolonged their work on the property.

not required to show that the very act in question previously was held unlawful in order to establish an absence of qualified immunity. *Weigel*, 544 F.3d at 1153. Rather, the court's inquiry is whether the contour of the divide is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

The court has not uncovered any Supreme Court or Tenth Circuit case examining the Fourth Amendment implications of a search or seizure under a civil writ of execution or in the civil judgment enforcement context. And plaintiff directs the court to no authority suggesting that his Fourth Amendment rights were clearly established at the time. Accordingly, in the absence of specific guidance to the contrary, Deputies Morris, Freeman and Whitby could have reasonably interpreted existing precedent (from the analogous, albeit different, context of a criminal case) to permit the restriction on Mr. Jordan's movement for the duration of the execution of the writ—particularly in light of the specific facts outlined above. *See Bray v. Planned Parenthood Columbia-Willamette Inc.*, 746 F.3d 229, 238 (6th Cir. 2014) (marshals who detained judgment debtor on the couch of his residence for more than 4 hours while enforcing an order of execution on property of the debtor did not violate clearly established Fourth Amendment rights of debtor because reasonable officer could have interpreted existing precedent in criminal context to permit detention; legal and factual scenario presented was not identical to any scenario the Sixth Circuit or the Supreme Court had previously addressed).

B.     *Handcuffed Detention in Patrol Car*

The court turns, then, to Mr. Jordan's claim concerning his handcuffed detention in the patrol car. Even assuming this detention violated Mr. Jordan's Fourth Amendment rights,

neither Deputy Morris nor Deputy Whitby may be held liable for it.   These deputies undisputedly played no active role in that detention.   And Mr. Jordan's theory that Deputy Morris and Deputy Whitby should have intervened to stop the detention necessarily fails in the absence of any admissible evidence that either deputy had any knowledge that Mr. Jordan had been handcuffed and detained in the patrol car.   It is undisputed that neither Deputy Morris nor Deputy Whitby observed the detention as both deputies were monitoring traffic near the end of the driveway until the time that Mr. Jordan was moved to the lawn chair.   In such circumstances, Mr. Jordan cannot show that Deputy Morris or Deputy Whitby could have taken some action to preclude the handcuffed detention or put a stop to it sooner.   *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (plaintiff cannot survive summary judgment on failure-to-intervene theory without showing that defendants had knowledge of a constitutional violation).

That leaves only Mr. Jordan's claim against Deputy Freeman.   Deputy Freeman played no part in handcuffing Mr. Jordan or placing him into the patrol car.   There is no evidence that Deputy Freeman played any part in deciding that Mr. Jordan should be handcuffed and detained in the patrol car or in determining how long Mr. Jordan remained in the patrol car.   The only evidence with respect to Deputy Freeman's involvement in the patrol car detention is that Deputy Freeman removed Mr. Jordan from the patrol car, moved the cuffs from the back to the front (the cuffs were removed entirely shortly thereafter), and then found a chair for Mr. Jordan. In light of these circumstances, Mr. Jordan contends only that Deputy Freeman had a reasonable opportunity to intervene to stop the detention earlier and failed to do so.   As noted earlier, Mr. Jordan, to withstand summary judgment on this theory, must first raise a genuine issue of

material fact as to an underlying constitutional violation.  *See Jones v. Norton,* 809 F.3d 564, 576 (10th Cir. 2015).

At this point, the analysis of Mr. Jordan's handcuffed detention claim largely tracks the analysis made earlier in connection with Mr. Jordan's claim that the restriction on his movement around his property violated his Fourth Amendment rights.  That is, Mr. Jordan must establish that the nature and extent of his handcuffed detention was unreasonable and, in assessing reasonableness, the court evaluates the officers' actions from the perspective of a reasonable officer on the scene.  *Bradford v. Wiggins*, 516 F.3d 1189 (10th Cir. 2008); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001).  The court concludes that the 75- to 90-minute handcuffed detention of Mr. Jordan was objectively reasonable.  The handcuffed detention occurred only for the length of time it took the SERT team to clear the property (which included the house, outbuildings and vehicles) and to seize and secure at least 30 firearms, some of which were loaded.  Because the SERT team was acting pursuant to a valid warrant, Mr. Jordan's detention would be plainly permissible in the context of executing a warrant for criminal contraband.  *See Michigan v. Summers*, 452 U.S. 692 (1981) (officers executing a search warrant have the authority to detain the occupants of the premises while a proper search is conducted); *Muehler v. Mena*, 544 U.S. 93, 99-100 (2005) (detention in handcuffs for the duration of two-to three-hour search was reasonable under *Summers*).  And because the rule permitting detention during the execution of a valid warrant is categorical, the

length of the detention has little bearing on the reasonableness of that detention. *See Muehler*, 544 U.S. at 98.[11]

The court recognizes, again, that the deputies here were executing a tax warrant in the civil context. But based on the specific facts set forth in connection with Mr. Jordan's claim about the restriction on his movement around the property, the court believes that the governmental interests underlying *Summers* and *Muehler* are applicable in this context. Mr. Jordan does not dispute that the SERT team uncovered 30 firearms during their clearance of the property; that some of these firearms were loaded; that the team believed that Mr. Jordan was a sovereign citizen; that the FBI had warned law enforcement agencies about encounters with sovereign citizens; and that Mr. Jordan had expressly forbidden government agents from entering his property. In light of these facts and a legitimate concern about the potential for violence, the SERT team acted reasonably in detaining Mr. Jordan while they cleared the property and Deputy Freeman acted reasonably in failing to preclude that detention or failing to end it sooner. *See Muehler*, 544 U.S. at 100 (in inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants).

Finally, as more fully explained above in connection with Mr. Jordan's claim concerning the restriction of his movement on the property, the court finds that even if the handcuffed detention of Mr. Jordan was unreasonable, Deputy Freeman is nonetheless entitled to qualified immunity on that claim. Specifically, the court concludes that Mr. Jordan's Fourth Amendment rights in the context of a civil writ of execution were not so "clearly established" such that a

---

[11] Significantly, Mr. Jordan does not challenge the length of time it took the SERT team to clear the property and he does not suggest that such clearance was unreasonably prolonged.

reasonable person in the position of Deputy Freeman would have been aware that the handcuffed detention of Mr. Jordan was unconstitutional when it occurred. *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008).

For the foregoing reasons, Deputy Morris, Deputy Freeman and Deputy Whitby are all entitled to qualified immunity on plaintiffs' claim that the deputies violated Mr. Jordan's Fourth Amendment rights by unlawfully seizing and detaining him in the patrol car and then "restricting" him to the lawn chair on his property.

## IV. Abandoned Claims

In the pretrial order, plaintiffs assert certain claims on behalf of their minor son, J.V.J. Specifically, plaintiffs contend that defendants unlawfully seized his property in violation of the Fourth, Fifth and Fourteenth Amendments or that defendants failed to intervene to prevent the unlawful seizure of his property; and that defendants assisted in the unconstitutional search of his property. Defendants have moved for summary judgment on every claim asserted on behalf of J.V.J. Plaintiffs' submissions do not address these claims in any respect and they mention no facts concerning the search or seizure of J.V.J.'s property. Plaintiffs, then, are deemed to have abandoned these claims and summary judgment is appropriate. *See Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (plaintiffs "appear to have abandoned [these] claims as evidenced by their failure to seriously address them in their briefs"); *Hinsdale v. City of Liberal, Kansas*, 19 Fed. Appx. 749, 768–70 (10th Cir. 2001) (affirming district court's grant of summary judgment in favor of defendant on certain claims after concluding that plaintiff had abandoned those claims by failing to address them in response to the defendant's motion for

21

summary judgment) (citing *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992)). In any event, the undisputed facts demonstrate that summary judgment is appropriate, as each of the defendants was unaware that the Department of Revenue had seized property belonging to plaintiffs' minor son and none of the defendants had any role in determining what property to seize. Finally, there is no evidence that any of the defendants participated in any search of any property belonging to plaintiffs' minor son.

Mr. Jordan also asserts in the pretrial order that defendants unlawfully exceeded the scope of the warrant and unlawfully seized unauthorized property. Defendants move for summary judgment on this claim, but Mr. Jordan fails to address it in any respect. The claim, then, has been abandoned and summary judgment is appropriate for that reason. Moreover, it appears that summary judgment would also be required on the merits of this claim, as it is uncontroverted that the warrant expressly included any real or personal property owned by plaintiffs and Mr. Jordan fails to identify any seized property that was allegedly beyond the scope of the warrant.

For the foregoing reasons, summary judgment is granted on plaintiffs' claims that defendants unlawfully seized property or failed to intervene to prevent the unlawful seizure of property from plaintiffs' minor son; that defendants assisted in the unconstitutional search of property belonging to plaintiffs' minor son; and that defendants unlawfully exceeded the scope of the warrant.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 101) is granted.

**IT IS SO ORDERED.**


Dated this 7th day of October, 2016, at Kansas City, Kansas.


                                                s/ John W. Lungstrum

                                                John W. Lungstrum
                                                United States District Judge